UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| MICHAEL GARNER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 2:12-CV-02076-PMP-GWF |
| | ) | |
| v. | ) | |
| | ) | |
| BANK OF AMERICA CORPORATION, | ) | |
| et al., | ) | ORDER |
| | ) | |
| Defendants. | ) | |

Presently before the Court is Defendants' Motion to Dismiss (Doc. #11), filed on January 2, 2013.  Plaintiffs filed an Opposition (Doc. #15) on February 8, 2013. Defendants filed a Reply (Doc. #22) on March 18, 2013.

**I.  BACKGROUND**

Plaintiffs are twenty-nine Nevada residents who borrowed money from one or more of the Defendants between January 2003 and December 2008 to purchase real property in Nevada, the loans being secured by first deeds of trust on the properties.  (Pet. for Removal (Doc. #1), Ex. A ("Compl.") at 9-14.)  Defendants are banks, mortgage servicing companies, trustees, and appraisal companies who provided the loans, serviced the mortgages, appraised the properties, were involved in loan modifications, and/or were involved in the foreclosure of the properties.  (Id. at 15-20, 22-26.)

Plaintiffs allege Defendants engaged in a scheme to inflate property values in Nevada through obtaining intentionally inaccurate appraisals to increase the amount borrowers would need to borrow to purchase property.  (Id. at 28, 35-42, 44-50.)  According

to the Complaint, Defendants artificially inflated property values so Defendants could underwrite more loans at higher amounts, resulting in both greater fees and profits in originating the loan, as well as raising the secondary market value of the loans, which Defendants sold soon after the loans were originated.  (Id. at 28-29, 32, 35-42, 49-50.) Plaintiffs allege that because Defendants sold the loans soon after origination, Defendants did not care whether the borrower could afford the loan because Defendants would pass the risk to investors who purchased the loans bundled into securities.  (Id. at 32-34.)

According to the Complaint, Defendants abandoned their normal underwriting procedures and engaged in a variety of activities designed to ensure unqualified borrowers obtained loans.  (Id. at 32-34, 51-54, 60-61.)  For example, Plaintiffs allege Defendants intentionally falsified borrowers' income and assets to enable them to qualify for loans they could not afford, and Defendants abandoned sound debt-to-income ratios in deciding whether to approve loans.  (Id. at 51-54.)  Plaintiffs allege Defendants intentionally placed unqualified borrowers in loans they could not afford because Defendants sold the loans, had insurance on such loans, Defendants made money on fees from defaulting borrowers when Defendants serviced those loans, and Defendants made more fees from foreclosure proceedings.  (Id. at 34, 36-37, 42-43, 55, 57.)  According to the Complaint, at the same time Defendants were abandoning their underwriting procedures, they were issuing public statements suggesting they were following prudent underwriting standards.  (Id. at 61-64.) Plaintiffs allege internal documents show Defendants were aware of the wrongful nature of their conduct at the time.  (Id. at 66-70.)

Plaintiffs further allege Defendants concealed material information from Plaintiffs prior to Plaintiffs entering into the loan transactions, including, among other things, that Defendants had abandoned prudent underwriting guidelines, that Defendants did so to intentionally place borrowers into loans they could not afford, that Defendants intentionally artificially inflated property values through their wholly-owned appraisal

company, that Defendants knew the true value of Plaintiffs' property was insufficient to justify the loan amounts, and that Defendants falsified Plaintiffs' income and asset documentation to place them into loans they could not afford.  (Id. at 72-77.)  Plaintiffs further allege Defendants failed to advise them that Defendants knew their conduct was wrongful and that Plaintiffs would be harmed as a result.  (Id. at 74-75.)  Instead, Defendants fostered a public reputation for quality underwriting.  (Id. at 77.)  According to the Complaint, Defendants knew their scheme eventually would fail and housing values would become depressed as a result, but Defendants did not advise Plaintiffs of this information.  (Id. at 78.)  Plaintiffs further allege a litany of misrepresentations, including failure to explain the terms of the loans, representing that the borrower could afford the loan, and that the appraised value was sufficient to justify the loan.  (Id. at 79-83, 143.)

Plaintiffs also allege Defendants refused to engage in good faith efforts at loan modifications, despite laws and court orders requiring them to negotiate in good faith.  (Id. at 83-87.)  Plaintiffs allege that because the pooling and servicing agreements with investors require Defendants to buy back a loan when there is a material misrepresentation, and because such misrepresentations also would void any insurance on the loan, Defendants refused modifications on any loan involving misrepresentations out of fear their misrepresentations would be discovered.  (Id. at 84-85.)  Additionally, Plaintiffs allege Defendants would advise Plaintiffs to fall behind on their loan payments to become eligible for a loan modification, but then would refuse to offer a loan modification.  (Id. at 85.)  As a result, no other lender would work with Plaintiffs because they were delinquent on their mortgages.  (Id. at 86.)  According to the Complaint, Defendants would offer Plaintiffs trial payment plans pursuant to which Defendants promised a permanent modification if Plaintiffs paid the trial mortgage payments for three months.  (Id.)  Plaintiffs contend Defendants never intended to modify the loans even if Plaintiffs made the trial payments.  (Id.)  Plaintiffs also contend Defendants foreclosed on property while modifications were

1   pending, despite promises that Defendants would not foreclose while modifications were

2   under review.  (Id. at 182-83.)  According to the Complaint, Defendants engaged in

3   wrongful foreclosures without establishing they owned the notes and deeds of trust.  (Id. at

4   88-104.)  Plaintiffs also allege Defendants charged unwarranted and inflated fees in relation

5   to the foreclosures.  (Id. at 88.)

6          Plaintiffs allege they were harmed because they would not have borrowed the

7   funds to purchase the properties had they known the property values were artificially

8   inflated.  (Id. at 29-30, 41.)  Plaintiffs also allege they were deceived as to how risky the

9   loans were, based on the inflated property value.  (Id. at 37-38, 42.)  Plaintiffs further

10  contend that because the property values created an artificial bubble, they lost equity and

11  their credit ratings were damaged when the housing bubble burst.  (Id. at 30, 59.)  Plaintiffs

12  also assert that because the property values were inflated, Plaintiffs had to borrow more

13  money, pay interest on a higher loan amount, pay higher points and fees on the higher loan

14  amount, and pay greater property taxes.  (Id. at 41-42.)

15         Plaintiffs brought suit in Nevada state court, asserting against Defendants

16  common law tort claims for fraudulent concealment (count one), intentional

17  misrepresentation (count two), negligent misrepresentation (count three), and wrongful

18  foreclosure (count seven).  Plaintiffs also assert Nevada statutory claims for unfair business

19  practices under the Nevada Deceptive Trade Practices Act ("NDTPA") (count four), false

20  representation concerning title in violation of Nevada Revised Statutes §§ 205.330 and

21  205.395 (count five), and negligence contributing to forged signature or alteration of

22  instruments in violation of Nevada Revised Statutes §§ 104.3406 and 107.080 (count six).

23  Finally, Plaintiffs assert claims for violation of appraiser independence under 15 U.S.C.

24  § 1639e and 12 C.F.R. § 225.65 (counts eight and nine).  Defendants removed the action to

25  this Court on December 5, 2012.  (Pet. for Removal.)

26  ///

Defendants now move to dismiss, arguing Plaintiffs are improperly joined in a single action, and the Court therefore should dismiss without prejudice all Plaintiffs except the first-named Plaintiffs, Michael Garner and Laura Garner.  Defendants further argue that the Garners' claims should be dismissed because they fail to plead fraud with particularity, their fraud claims are barred by the statute of limitations, the NDTPA does not apply to real estate loan transactions and any such claim would be time-barred, and the two appraiser independence claims are brought under a statute and regulation that do not provide a private cause of action.  Defendants do not move to dismiss the foreclosure related claims in counts six and seven because the Garners do not assert Defendants foreclosed on their property.

Plaintiffs respond they are properly joined in one action because their claims arise out of the same series of transactions or occurrences and Plaintiffs raise at least one common question of law or fact.  Plaintiffs also contend their claims are timely because they have alleged did not discover their claims until 2011 or 2012.  Plaintiffs argue Defendants' concealment of material facts establishes Plaintiffs could not have discovered their claims earlier.  Additionally, Plaintiffs contend that when they discovered their claims is a fact-based question not suitable for resolution at dismissal.

As to the fraud-based claims, Plaintiffs argue they adequately have pled fraud with particularity, both in the general allegations in the Complaint as well as particularized allegations as to each Plaintiff in the Appendix attached to the Complaint.  As to the NDTPA claim, Plaintiffs contend the NDTPA applies to any knowingly false representation in a transaction, including real estate loan transactions.  Plaintiffs concede they have no cause of action for appraiser independence in counts eight and nine.

**II. DISCUSSION**

**A. Joinder**

Defendants contend Plaintiffs are not properly joined in a single action because their allegations involve different loans, obtained from different lenders, at different times,

1    based on different representations, with different loan terms, for different properties.

2    Defendants also contend only some Plaintiffs have claims related to modifications or

3    foreclosures, and each modification or foreclosure will involve different facts.  Defendants

4    thus argue Plaintiffs' claims do not arise out of the same transaction or series of

5    transactions, and Plaintiffs should not be joined in a single lawsuit.  Defendants request the

6    Court sever and dismiss without prejudice all claims but those of the first-named Plaintiffs,

7    Michael and Laura Garner.

8         Plaintiffs respond that the Complaint alleges they are common victims of

9    Defendants' conspiracy, and thus their claims, while distinct in the particulars, arise out of

10   the same series of transactions with Defendants.  Plaintiffs also contend there are common

11   questions of fact and law that make joinder appropriate.

12        Pursuant to Federal Rule of Civil Procedure 20(a), plaintiffs may be joined in one

13   action if (1) "they assert any right to relief jointly, severally, or in the alternative with

14   respect to or arising out of the same transaction, occurrence, or series of transactions or

15   occurrences," and (2) "any question of law or fact common to all plaintiffs will arise in the

16   action."  Even if these requirements are met, the Court determines whether joinder is

17   appropriate in a particular case, considering the "principles of fundamental fairness," and

18   any potential prejudice.  Coleman v. Quaker Oats Co., 232 F.3d 1271, 1296 (9th Cir. 2000)

19   (quotation omitted).  The Court should consider Rule 20's purposes, including promoting

20   judicial economy and reducing inconvenience, delay, and expense.  Coughlin v. Rogers,

21   130 F.3d 1348, 1351 (9th Cir. 1997).  If joinder is not appropriate, the Court may sever and

22   dismiss without prejudice all inappropriately joined plaintiffs except the first-named

23   plaintiff, "so long as no substantial right will be prejudiced by the severance."  Id. at 1350

24   (citing Fed. R. Civ. P. 21).  Whether to sever lies within the Court's discretion.  Id.

25        Here, the Court concludes, in its discretion, that severance is not appropriate at

26   this time.  Plaintiffs have alleged they were injured by Defendants' conspiracy and various

6

schemes Defendants perpetrated in common against Plaintiffs.  Such allegations satisfy
Rule 20's requirement that Plaintiffs' claims arise out of the same series of transactions.
See United States v. Mississippi, 380 U.S. 128, 142-43 (1965) (holding joinder of six
county registrars in a single action was appropriate given allegations that the registrars
committed separate torts as part of a state-wide conspiracy to deprive African-American
voters of their right to vote); Coughlin, 130 F.3d at 1350 (holding joinder was inappropriate
in part because the plaintiffs did "not allege that their claims arise out of a systematic
pattern of events and, therefore, arise from the same transaction or occurrence").

Additionally, a common question of fact exists among all Plaintiffs regarding
whether Defendants were engaged in the conspiracy and its various schemes as alleged.
Resolving this question once, rather than nineteen[1] separate times, promotes judicial
economy and reduces inconvenience, delay, and expense.  Consequently, the Court, in its
discretion, will not sever at the present stage of the case.

### B.  Statute of Limitations

Defendants argue Plaintiffs' misrepresentation-based claims in counts one, two,
three, and five are time-barred under Nevada's three-year limitations period for fraud.
Defendants argue that Plaintiffs entered into their loans more than three years before the
present lawsuit was filed, and thus their claims are barred.  Defendants contend the
discovery rule does not assist Plaintiffs because Plaintiffs possessed all information relevant
to the discovery of any disclosures or nondisclosures upon receiving their loan documents.
For these same reasons, Defendants argue Plaintiffs' NDTPA claim in count four likewise
is untimely.

///

---

[1]  Although there are twenty-nine Plaintiffs, some of the loan transactions involved multiple
Plaintiffs.  ((Exs. to Defs.' Pet. for Removal (Doc. #8), Appx. A to Compl.)

Plaintiffs respond that the limitations period for fraud-based claims begins to run only upon the plaintiff actually discovering his or her claim. Plaintiffs contend they have alleged when each Plaintiff discovered his or her claim, and the earliest discovery was in 2011. Plaintiffs further argue the question of whether the discovery rule tolls the limitations period is a fact-based inquiry not suitable for resolution at the dismissal stage.

Nevada's statute of limitations for fraud-based claims is three years from accrual, but a fraud claim does not accrue until the aggrieved party discovers "the facts constituting the fraud." Nev. Rev. Stat. § 11.190(3)(d). A claim under the NDTPA must be brought within four years from accrual, "but the cause of action shall be deemed to accrue when the aggrieved party discovers, or by the exercise of due diligence should have discovered, the facts constituting the deceptive trade practice." Id. § 11.190(2)(d). Generally, it is a factual question "[w]hen the plaintiff knew or in the exercise of proper diligence should have known of the facts constituting the elements of his cause of action." Siragusa v. Brown, 971 P.2d 801, 806 (Nev. 1998) (quotation omitted). Thus, "the time of discovery may be decided as a matter of law only where uncontroverted evidence proves that the plaintiff discovered or should have discovered the fraudulent conduct." Id.

In the present case, each Plaintiff entered into their loans from 2005 to 2007. (Exs. to Defs.' Pet. for Removal (Doc. #8), Appx. A to Compl.) Consequently, Plaintiffs' claims are time-barred if their claims accrued at the time Plaintiffs signed the loan documents, as Defendants contend.

Plaintiffs allege Defendants misrepresented the terms of their loans and misrepresented that Plaintiffs could afford their loans. All such claims could have been discovered with reasonable diligence upon reviewing the loan documents. Consequently, to the extent Plaintiffs' claims are based on misrepresentations or omissions related to the terms of Plaintiffs' loans or whether Plaintiffs were qualified or could afford such loans, their claims are untimely. The Court therefore will grant Defendants' Motion to Dismiss

Plaintiffs' fraud-based and NDTPA claims as untimely, to the extent those claims are based on alleged misrepresentations and omissions regarding Plaintiffs' loan terms or their ability to afford their loans.  (See Compl. at ¶¶ 222(a)-(b), (j), (l), (m), (o), (p)-(y), (aa), (ee)-(ii), ¶ 238, ¶ 239(a)-(f), (i)-(o).)

However, Plaintiffs also allege Defendants intentionally manipulated property values through falsely inflated property appraisals, both in the market generally and with respect to the appraisals of Plaintiffs' particular properties.  Additionally, Plaintiffs allege Defendants knew the market would collapse and destroy property values as a result of Defendants' scheme, but Defendants did not disclose this information to Plaintiffs.  An intentionally false appraisal would not be discoverable upon review of the loan documents, nor would Defendants' alleged knowledge that the real estate market would collapse. Rather, Plaintiffs allege each of them discovered their claims in 2011 and 2012.  When Plaintiffs discovered their claims related to inflated appraisals or Defendants' failure to advise of an impending market collapse, and whether they should have discovered these claims earlier, are fact-based questions not suitable for resolution at the dismissal stage. Unlike Plaintiffs' claims related to their loan terms, nothing on the face of the Complaint shows Plaintiffs discovered or should have discovered these claims earlier than as alleged. The Court therefore will deny Defendants' Motion to Dismiss Plaintiffs' fraud-based and NDTPA claims as untimely, to the extent those claims are based on intentionally false appraisals or Defendants' failure to disclose that the market would collapse due to Defendants' scheme.  (See Compl. at ¶¶ 222(c)-(i), (k), (n), (z), (bb)-(dd), ¶ 239(g)-(h).)

### C.  Pleading Fraud with Particularity

Defendants contend Plaintiffs fail to plead fraud with particularity because they group Defendants together without alleging which Defendant engaged in what conduct. Defendants further argue Plaintiffs fail to plead with specificity when, where, or in what form the misrepresentations occurred or who made the misrepresentations.  Defendants also

argue Plaintiffs fail to allege justifiable reliance because they do not allege which
Defendant exercised control over the appraiser or how it did so.  Defendants also contend a
claim for fraud based on an appraisal is not actionable because an appraisal is an opinion.
According to Defendants, Plaintiffs also fail to allege causation because property values rise
and fall for a variety of reasons, and Plaintiffs cannot show their losses are attributable to
Defendants' conduct.

Plaintiffs respond they adequately have alleged the role each Defendant played in
the scheme, and they allege that Defendants conspired to achieve a common purpose.
Plaintiffs thus argue they did not improperly lump Defendants together because Defendants
acted together to further the conspiracy.  Plaintiffs also argue they adequately have alleged
what Defendants did, as well as when and how they did it, both through the general
allegations as well as the particularized allegations with respect to each Plaintiff.  Plaintiffs
contend they adequately have pled justifiable reliance because Plaintiffs justifiably relied on
the belief they were purchasing property in a normal, unmanipulated market.  Plaintiffs
further assert that appraisals can form the basis of a fraud claim, and Plaintiffs justifiably
relied on the misrepresented appraisals of their properties.  Plaintiffs also argue they
adequately have alleged causation because they have alleged Defendants were the cause of
the market crash, Defendants are liable if they are substantial contributors to the market
crash even if they are not the sole cause, and, in any event, causation is a fact question not
suitable for resolution at dismissal.

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake,
a party must state with particularity the circumstances constituting fraud or mistake."  To
satisfy this burden, the complaint must state "the who, what, when, where, and how of the
misconduct charged."  Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir.
2010) (quotation omitted).  Additionally, the complaint "must set forth what is false or
misleading about a statement, and why it is false."  Id. (quotation omitted).  When suing

multiple defendants, a plaintiff may not "merely lump multiple defendants together." Swartz v. KPMG LLP, 476 F.3d 756, 764-65 (9th Cir. 2007). Rather, the plaintiff's allegations must "inform each defendant separately of the allegations surrounding his alleged participation in the fraud." Id. (quotation omitted). "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme.'" Id. (quoting Moore v. Kayport Package Express, Inc., 885 F.2d 531, 541 (9th Cir. 1989)).

### 1.  Grouping Defendants

Plaintiffs' allegations often group Defendants together without differentiating which Defendant engaged in what conduct. However, Plaintiffs have alleged Defendants jointly engaged in a conspiracy to defraud and have alleged each Defendants' role in the alleged fraudulent scheme, with the exception of Defendant Countrywide LP, Inc. (Compl. at ¶¶ 39-59, 73, 76-83, 89-90, 101, 131, 143-50, 284; Exs. to Defs.' Pet. for Removal, Appx. A to Compl.) The only allegation as to Defendant Countrywide LP, Inc. is that it is a Nevada corporation or a division or subsidiary of Bank of America doing business in Nevada. (Compl. at ¶ 56.) The Complaint does not identify what, if any, actions this Defendant took or what role this Defendant played in the alleged conspiracy. The Court therefore will deny Defendants' Motion to Dismiss for failure to allege each Defendant's role in the conspiracy, except the Court will grant the Motion as to Defendant Countrywide LP, Inc., with leave to amend to add factual allegations regarding this Defendant's role in the alleged conspiracy.[2]

### 2.  Appraisal as a Basis for Fraud

Generally, estimates or opinions of value may not form the basis of a fraud claim, but there are exceptions. Clark Sanitation, Inc. v. Sun Valley Disposal Co., 487 P.2d 337,

---

[2] Plaintiffs identify two different entities as "Countrywide." (See Compl. ¶¶ 53, 56.) Plaintiffs should correct this discrepancy in any amended complaint.

339 (Nev. 1971).  For example, Nevada has allowed a lender to pursue a negligent misrepresentation claim against the appraiser it hired based on a faulty appraisal of real property upon which the lender relied in deciding whether to proceed with a loan.  Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc., 101 P.3d 792, 795 (Nev. 2004).

Nevada has not specifically addressed whether a borrower could pursue such a claim against an appraiser or lender for knowingly and intentionally providing a false appraisal to the borrower to induce the borrower to take out a larger loan than otherwise would be required to purchase the property.  However, Nevada follows the Restatement (Second) of Torts § 552, which sets forth a claim for negligent misrepresentation:

> (1) One who, in the course of his business, profession or employment, or in any other action in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Barmettler v. Reno Air, Inc., 956 P.2d 1382, 1387 (Nev. 1998).  There is no basis to conclude that Nevada would hold that negligently providing misinformation would subject a defendant to liability, but knowingly and intentionally providing misinformation would not.  The Court therefore will deny Defendants' Motion to Dismiss to the extent Defendants argue that a false appraisal never may form the basis of a fraud or misrepresentation claim under Nevada law.  However, as discussed above, Plaintiffs fail to allege with particularity whether, how, when, or from whom they obtained the appraisals, and whether they justifiably relied on those appraisals in deciding to take out a loan in a certain amount.

### 3.  Particularity of the Fraud/Justifiable Reliance

Plaintiffs' attempt to rely on a fraud-on-the-market theory to allege reliance is misplaced.  The fraud-on-the-market theory "permits a plaintiff to establish a rebuttable presumption of reliance based upon the premise that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material

misrepresentations.'" <u>Appletree Square I, Ltd. P'ship v. W.R. Grace & Co.</u>, 29 F.3d 1283, 1287 (8th Cir. 1994) (quoting <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 246 (1988)). This theory does not apply here "because the presumptions underlying the theory are not present. The real estate market, unlike the stock market, is not a well-developed market in which the price of a building reflects all publicly available information." <u>Id.</u>  Consequently, Plaintiffs cannot rely on a fraud-on-the-market theory to allege justifiable reliance.

Further, except for appraisals conducted by Defendant LandSafe Appraisals, which is alleged to be a wholly owned subsidiary of Countrywide created for the very purpose of generating inflated appraisals,[3] Plaintiffs have failed to allege who created the allegedly false appraisals or how Defendants are responsible for these appraisers' alleged fraudulent misconduct.  For most Plaintiffs in this action, Plaintiffs do not identify the appraisal company that purportedly generated the false appraisal, which Defendant controlled and supervised the unidentified appraiser, or how Defendants accomplished this control and supervision to further the alleged fraud.  While Plaintiffs make general allegations that Defendants as a general matter blacklisted and coerced appraisers, Plaintiffs do not tie these general allegations to the appraisers in any of their particular transactions, except for Defendant LandSafe Appraisals.  Plaintiffs' conclusory allegations that an unidentified appraisal company was "under the direct control and supervision of Defendants" does not plead fraud with the requisite particularity.

Additionally, the Complaint fails to allege with particularity which Defendant provided Plaintiffs the appraisals, when they did so, that Plaintiffs justifiably relied on appraisals obtained by Defendants, or that Plaintiffs relied on the appraisal or any other representation of value made by any Defendant in deciding whether to take out a loan at all or in a certain amount.  Nor do Plaintiffs allege any such reliance was justifiable under the

---

[3] (<u>See, e.g.</u>, Compl. at ¶¶ 89, 131, 146.)

circumstances, such as whether Plaintiffs justifiably relied on an appraisal to the extent it was performed by the lender's agent for lender's benefit.  The Court therefore will grant Defendants' Motion to Dismiss counts one, two, three, and five to the extent those claims are based on the allegedly fraudulent appraisals for failure to plead fraud with particularity, with leave to amend to cure the identified deficiencies.[4]

### 4.  Causation

Plaintiffs adequately have alleged causation.  Plaintiffs allege Defendants had sufficient market share to affect property values in the relevant market.  (See, e.g., Compl. at ¶¶ 58, 89, 133.)  Whether Plaintiffs can prove Defendants had sufficient market share to cause the housing market to artificially rise and then decline dramatically when Defendants' alleged scheme collapsed is a fact question not suitable for resolution at dismissal.  See Klasch v. Walgreen Co., 264 P.3d 1155, 1161 (Nev. 2011) (en banc) (citing Nehls v. Leonard, 630 P.2d 258, 260 (Nev. 1981)); see also Holcomb v. Georgia Pac., LLC, 289 P.3d 188, 196 (Nev. 2012) (stating a plaintiff may show a defendant's conduct was a substantial factor in causing the plaintiff's injury if the injury "had two causes, either of which, operating alone, would have been sufficient to cause the injury" (quotation omitted)).  Even if Plaintiffs have not plausibly alleged Defendants caused the decline in property values, Plaintiffs allege other damages caused by Defendants' alleged scheme.  For example, Plaintiffs allege that due to the fraudulently inflated property values, Plaintiffs were forced to pay more for their homes, take out higher principal loans, and pay more in interest, points, fees, and property taxes than they would have had to pay had they not been deceived about the properties' true value.  (Compl. at ¶ 135.)  The Court therefore will deny Defendants' Motion to Dismiss for failure to allege causation.

---

[4] Defendants' Motion does not argue Plaintiffs failed to adequately allege justifiable reliance with respect to allegations that Defendants fraudulently concealed an impending market crash due to Defendants' schemes.

### D. NDTPA

Defendants argue the NDTPA cannot apply to a real estate loan transaction as a matter of law.  However, the Nevada Supreme Court has rejected the argument that "Chapter 598's statutory scheme does not regulate the deceptive sale of real property." Betsinger v. D.R. Horton, Inc., 232 P.3d 433, 436 n.4 (Nev. 2010) (stating the Court "reject[s] respondents' narrow interpretation of NRS Chapter 598 and conclude[s] that this argument is without merit").  In Betsinger, the Nevada Supreme Court upheld jury verdicts against both a home builder and the home builder's financing division under Chapter 598, based on the builder's broken promise to return the plaintiff's deposit as well as the financing division's "bait and switch" of the offered mortgage rate.  Id. at 434-36.  Thus, the Court rejects Defendants' argument that Chapter 598 categorically cannot apply to real estate loan transactions.[5]

### E. Appraiser Independence

Plaintiffs concede their claims for violations of a federal statute and regulation based on a lack of appraiser independence fail to state a claim.  The Court therefore will grant Defendants' Motion to Dismiss counts eight and nine.

## III. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (Doc. #11) is hereby GRANTED in part and DENIED in part, as more fully set forth in this Order.

IT IS FURTHER ORDERED that Plaintiffs shall have until October 29, 2013 to file a Second Amended Complaint if they believe they can correct the noted deficiencies.

---

[5] To the extent Harlow v. LSI Title Agency, Inc. is inconsistent with this conclusion, the Court notes that the Court denied the Harlow plaintiff's NDTPA claim because she failed to respond to the defendant's motion to dismiss her NDTPA claim. No. 2:11-CV-01775-PMP-VCF, 2012 WL 5425722, at *5 (D. Nev. 2012) (unpublished).  The Court's comments on whether a particular subsection of Chapter 598 applies to real estate or foreclosure transactions therefore was dicta.  In any event, Betsinger expresses the Nevada Supreme Court's view on the matter, and the Court must follow the Nevada Supreme Court's interpretation of a Nevada statute.

Failure to comply with this Order will result in dismissal, with prejudice, of the claims

Plaintiffs are permitted to amend.


DATED: September 28, 2013

_____
PHILIP M. PRO
United States District Judge